# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| KARL W ASH, | ) | CASE NO. 5:21-CV-00526-PAB |
|  | ) |  |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
|  | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) |  |
|  | ) |  |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY ADMINISTRATION, | ) | JENNIFER DOWDELL ARMSTRONG |
|  | ) |  |
|  | ) | **REPORT AND RECOMMENDATION** |
| Defendant, |  |  |

## I.      INTRODUCTION

Plaintiff Karl W. Ash ("Ash") seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. (ECF Doc. 1). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, I RECOMMEND that the Court OVERRULE Ash's assignments of error and AFFIRM the Commissioner's decision.

## II.     PROCEDURAL HISTORY

On May 13, 2019, Ash protectively filed a Title II application for DIB, alleging that he became disabled on January 20, 2018. (Tr. 15). After the Social Security Administration denied his application, he attended a hearing on his claim before Administrative Law Judge ("ALJ")

Charles Shinn. (Tr. 42-73). The ALJ denied Ash relief. (Tr. 15-37). The ALJ's decision became

final on January 4, 2021, when the Appeals Council declined further review. (Tr. 1-6).

On March 8, 2021, Ash filed his Complaint challenging the Commissioner's final decision.

(ECF Doc. 1). The parties have completed briefing in this case. (ECF Docs. 15, 17, and 18). Ash

asserts the following assignments of error:

(1)  The appointment of Andrew Saul as Commissioner of the Social Security
Administration violated the separation of powers. As such, the decision in this case
by an ALJ who derived his authority from Andrew Saul was constitutionally
defective.

(2) The ALJ's RFC was not supported by substantial evidence as he failed to properly
evaluate the evidence documenting the combination of Ash's severe impairments
and make a proper determination at Step Three of the Sequential Evaluation as to
whether Ash satisfied the criteria of Listing 1.04 due to spinal arachnoiditis.

(3) The ALJ erred in his determination regarding the persuasiveness of Ash's treating
source and his evaluation of Ash's symptoms was in violation of Social Security Ruling
16-3p.

(4)  At Step Four of the Sequential Evaluation, the ALJ's RFC was not supported by
substantial evidence when he erroneously found that Ash could still perform his pas
work as an Archivist.

(ECF Doc. 15, PageID#691).

## III.    BACKGROUND

### A.  <u>Personal, Educational, and Vocational Experience</u>

Karl W. Ash was 56 years old on the alleged onset date. (*See* ECF Doc. 11, PageID#101).

He has a driver's license and lives with his wife and one of his daughters. (ECF Doc. 11,

PageID#107).  Ash worked as a Librarian from 2003 to 2004. (Tr. 34). He also worked as an

Archivist between 2009 and 2011. (*Id.*).

### B.  <u>Relevant Opinion Evidence</u>

#### *1. Raymond Mason, M.D.*

2

Dr. Mason diagnosed Ash with back pain with radiculopathy, lipoma of back, and restless back. (Tr. 510). He indicated that Ash experienced blurred vision and poor balance as side effects of taking Lyrica. (*Id.*). He opined that Ash was unable to work. (Tr. 511, 513). He indicated that Ash needed a cane for both walking and standing. (Tr. 512). He also opined that Ash could rarely lift less than 10 pounds and never lift 10 pounds or more. (*Id.*). He noted that Ash would likely be off task 25% or more. (*Id.*). He wrote that Ash's impairments were likely to produce "all bad days." (Tr. 513).

### 2. Medical Consultants (Linda Hall, MD; Elizabeth Pas, MD; and Ateeg Patel, MD)

After a review of Ash's available records, Dr. Linda Hall concluded that Ash had the severe impairment of degenerative disc disease. (Tr. 81). She opined that he was able to lift 10 pounds frequently and 20 pounds occasionally, sit for about six hours, and stand/walk for about six hours in a normal eight-hour workday. (Tr. 79-80). Dr. Hall also indicated that Ash could frequently push/pull/foot control with his left leg. She further opined that he could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, or crawl; and was limited to frequent balancing. (*Id.*).

Dr. Elizabeth Das reviewed Ash's medical records and affirmed Dr. Hall's conclusion regarding Ash's residual functional capacity. (Tr. 91-93). Upon review of Ash's medical records, Dr. Ateeg Patel affirmed Dr. Hall's and Dr. Das's conclusions regarding Ash's residual functional capacity. (Tr. 500-01).

### 3. Annette Carol Ash's Third Party Function Report

In Ash's Third Party Function Report, his wife stated that Ash's biggest issue is sitting for more than 15 to 20 minutes and standing for more than five to 10 minutes at a time. (Tr. 236). Ash's wife described his daily activities, which included showering, putting dishes away, taking a

3

walk for exercise, and doing chores (but having to rest in between). (Tr. 237). Ash's wife indicated that he would help his mother a few times a week with shopping and chores, but "nothing strenuous." (*Id.*). Ash's wife stated that taking Ash's mother out to shop means Ash has to lay down when he gets home. (*Id.*). Ash's wife indicated that he does household chores such as laundry, mopping, sweeping, "some" cleaning, dishes, and goes to the store (but not for grocery shopping). (Tr. 238). She noted that he does these activities with difficulty. (*Id.*). She stated that he goes out for a walk daily for exercise but uses a cane. (Tr. 239). She wrote that Ash has a motorcycle, but he can only ride 15-30 minutes at a time and has only been out two to three times during the year her report was written. (Tr. 240). For social activities, she stated that Ash would go to family gatherings occasionally and would talk to his brothers and mother on the phone. (*Id.*). Finally, she indicated that Ash's conditions affected his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks. (Tr. 241). Specifically, she wrote that Ash can no longer lift as much as he could previously and, if he did, he would be in pain for hours and sometimes into the next day. (*Id.*). She also stated that Ash cannot tolerate more than 20 to 30 minutes of standing at best. (*Id.*).

### C. Relevant Hearing Testimony

#### 1. *Ash's Testimony*

Ash testified at the hearing. He is right hand dominant. (Tr. 49). He has a driver's license and lives with his wife and one of his daughters. (Tr. 50). He was taking medication and experienced side effects of blurred vision, wooziness, weight gain, and increased grouchiness. (Tr. 51). His doctor suggested a spinal cord stimulator to help reduce his pain. (Tr. 52). He indicated that he was a "bit worried to get it in there, and [that he was] not ready yet." (*Id.*). When asked about his pain, Ash testified that his pain occurred if he made the wrong move or sat in the wrong

position. (Tr. 53). If this happened, he reported that pain would radiate down to his hips and legs. (*Id.*). While Lyrica helped with his pain, he testified that he could not function without it. (*Id.*).

On a good day, Ash testified that he could stand for approximately 30 minutes and could sit for approximately five minutes before having to get up and walk around or change positions. (Tr. 54). After five minutes, he testified that his legs would start jerking around and the pain in the middle of his back felt like somebody was sticking a knife in his back. (*Id.*). During the day, he said that he needed to lie down to relieve his pain. (Tr. 55). He asserts that he has constant spasms. (Tr. 56).

Prior to surgery, Ash testified that he used a cane because he could not stand up without it. (Tr. 56-57). Although he followed through on physical therapy, he explained that he did not experience the results he expected after his 2018 back surgery. (*See* Tr. 57-58). He stated that his left leg is worse than his right leg. (Tr. 58). He also testified that he rode his motorcycle once following his surgery, but only because his daughter wanted to do so. (Tr. 61).

Ash also described his typical day. (Tr. 59-60). He stated that he wakes up, takes medication, goes downstairs to make his wife breakfast, showers, does the dishes, does laundry (but needs help carrying laundry), and helps his terminally ill mother whenever she needs him, though his brother does the majority of these tasks. (*Id.*). He also testified that he can still drive, but sitting in a car or trying to travel within a vehicle was "super painful" for him. (*Id.*). The pain he experiences is dependent on the position he is in while in the vehicle, but he affirmed that he could still drive. (*Id.*).

After his surgery in 2018, Ash testified that his life "completely changed." (Tr. 62). He indicated that he was no longer able to do things that he previously loved doing, such as playing a

guitar. (*Id.*). Ash stated that he can barely hold his guitar because placing weight on his neck was a problem. (*Id.*). He also testified that his activity level has been reduced from 100% to 20%. (*Id.*).

### 2. *Vocational Expert's Testimony*

Daniel Simone testified as a vocational expert ("VE") at the hearing. In his first hypothetical question, the ALJ asked the VE whether a hypothetical individual with Ash's limitations could perform work at the sedentary level of exertion as an Archivist. (Tr. 65-66). The VE responded that a hypothetical individual with the posed limitations could return to the past job of an Archivist as it is typically performed. (Tr. 66). If, however, the hypothetical person needed to limit sitting to three hours in 15-minute increments, and standing and walking to one hour in five-minute increments, the VE testified that the individual would not be able to perform the job of an Archivist because it typically requires sitting for more than three hours in an eight-hour day. (*Id.*). If the hypothetical person had a limitation where they had to be off task in the work setting 25% of the day due to pain, the VE opined that the individual could not perform his past job as an Archivist. (Tr. 67). Further, if this hypothetical person needed a cane, the VE stated that he would not be able to perform his past work. (Tr. 67-68). In response to questioning from Ash's counsel, the VE testified, based on his professional experience, that the work of an Archivist is typically performed without continuous sitting because they have to get up and walk to different materials, make notes, and sometimes to make copies. (Tr. 70-71).

### D. <u>Relevant Medical Evidence</u>

#### 1. *Pre-Surgery*

In March 2018, Ash went to the emergency room with low back pain. (Tr. 325). He reported an injury due to lifting tires and now was unable to walk. (Tr. 325-26). An examination revealed

pain with movement, positive straight leg raise, and muscle spasm, though Ash still possessed full strength and sensation. (Tr. 326).

On June 14, 2018, Ash met with Omni Orthopaedics regarding pain in his lumbar spine area. (Tr. 244). During the examination, Dr. Dorfman observed Ash ambulating with a cane held in the right upper extremity. (Tr. 246). He had a healed scar midline in the thoracic region from a prior fusion. (*Id.*). Dr. Dorfman assessed Ash with radiculopathy in the lumbar region, other intervertebral disc degeneration in both the lumbar and thoracic regions, fusion of the spine in the thoracic region, and spondylosis without myelopathy or radiculopathy in the thoracic region. (*Id.*) Reflexes were absent on the right knee and ankle, but present on the left. (*Id.*).

During his August 6, 2018 appointment, Ash reported numbness and tingling and rated his pain as six on a level of 10. (Tr. 248-49). A review of Ash's July 2018 MRI revealed an intradural extramedullary mass at L2 with multilevel degenerative disc disease and spondylotic change with foraminal stenosis, most notably at L4-5 and L5-S1 levels and contact with descending S1 nerve root. (Tr. 249-50).

In August 2018, Ash's EMG was interpreted as an abnormal examination. (Tr. 257). It revealed L4-5 radiculopathy and chronic abnormality in L2 distribution. (*Id.*). The findings were consistent with, but not diagnostic of, L5-S1 compression. (*Id.*).

Also in August 2018, Ash's MRI with and without contrast showed an intradural mass at L2 and degenerative changes similar to the prior study. (Tr. 262).

## 2. Surgery (Laminectomy with Resection of Intradural Mass)

Prior to his operation, Ash reported his pain level as five on a scale of six. (Tr. 267). His examination showed full range of motion of all extremities. (Tr. 268). On October 11, 2018, Ash had surgery for an L2 laminectomy with resection of intradural mass. (Tr. 271-73). This operation

removed a tumor growing off one nerve root. (Tr. 272). The next day, Ash was up and able to go to the bathroom with a slight increase in pain. (Tr. 275). Three days later, Ash was discharged in satisfactory condition. (Tr. 284).

### 3. *Post-Surgery*

After Ash's surgery, he went to a series of postoperative physical therapy visits between November 2018 to April 2019.

- At his November 9, 2018, physical therapy evaluation, Ash reported a pain level of 9/10. He was given precautions of no bending, lifting, or driving. (Tr. 409).

- During the first two months of his postoperative therapy (10 visits), Ash reported reduced pain to 5/10 and showed fair exercise tolerance. (Tr. 403,399,394).

- On January 7, 2019, a progress update indicated improvement and gains in meeting his initially assessed goals of reducing pain, improving mobility and balance, improving range of motion at the lumbar spine, and improving strength in his lower extremities. (Tr. 381-83). He displayed full 5/5 muscle strength throughout his lower extremities, except for reduced (4+/5) graded strength in his left knee and left hip flexors. (*Id.*). He demonstrated moderately limited range of motion at the lumbar spine and reported pain as 5/10 to 6/10. (*Id.*).

- On January 28, 2019, Ash's postoperative restrictions were lifted, and he was permitted to lift and do bending movements as per his pain tolerance. He also was permitted to drive and wean himself from his back brace. (Tr. 357).

- Over the course of 17 visits during the next two months until March 11, 2019, Ash reported "minimal" distress after each physical therapy session, and a pain intensity level of 4/10 (low-moderate). (*See generally* Tr. 379, 378, 373, 365, 363, 363, 359). He no longer ambulated with a cane and showed improved gait pattern and posture. (*Id.*)

- On March 11, 2019, Ash demonstrated improvement, though he did not meet his goals for full improvement. He showed full 5/5 strength throughout all muscle groups of the bilateral lower extremities, ambulated without the assistance of a cane, and reported 5/10 (moderate) pain level. (Tr.355-58).

- Through April 8, 2019, Ash did not present with a cane when walking during his physical therapy sessions. He reported 4/10 to 5/10 in pain intensity level. (Tr. 352, 349, 346, 343-45).

On January 18, 2019, Ash's right shoulder lipoma was excised. (Tr. 320).

On May 7, 2019, Ash visited Dr. Mason reporting upper right quadrant pain. (Tr. 458). The examination showed right upper quadrant pain on palpation. (*Id.*). Ash also requested a handicap placard for back pain with radiculopathy. (*Id.*). He reported a 5/10 in pain. (*Id.*).

On October 9, 2019, Ash visited his treating neurosurgeon's office for a one-year follow-up evaluation and to obtain certification for a new MRI as surveillance for any recurrence of the tumor. (Tr. 506). He reported a tingling sensation in his left leg and weakness in his left foot, pain with standing and - over the past few months - difficulty sitting without increased low back pain. (*Id.*). His motor strength for his left lower extremity was 4/5 and his motor strength for his right lower extremity was 5/5. (Tr. 507). He also presented with a cane. (*Id.*).

On November 1, 2019, Ash visited Dr. Hartzfeld with complaints of low back pain and lumbar radiculopathy. (Tr. 503).  Dr. Hartzfeld observed that Ash was utilizing a cane because he felt weak in his leg. (*Id.*). Ash reported neuropathic pain in his lower extremities, especially on his left extremities. (*Id.*). Dr. Hartzfeld suggested that Ash would be an excellent candidate for a spinal cord stimulator trial. (*Id.*). A review of an October 2019 post-surgical MRI revealed expected post-surgical changes and no evidence of tumor recurrence. (Tr. 504). Dr. Hartzfeld noted that there was unchanged degenerative changes throughout, without significant central canal stenosis, and a "small degree of expected arachnoiditis given his history." (*Id.*). Ash had 4/5 motor strength in his lower left extremity and 5/5 motor strength in his lower right extremity. (*Id.*).

On January 18, 2019, another tumor was removed from Ash's right shoulder. (Tr. 320-21).

On June 8, 2020, Ash saw Dr. Mason for constant pain in his back and legs, as well as weakness in the leg(s). (Tr. 613). His physical examination revealed nonspecific signs of decreased

range of movement, joint tenderness, and limping. (Tr. 616). Dr. Mason prescribed Prednisone (an

oral steroid), and increased Ash's dosage of Lyrica. (Tr. 617).

## IV.    THE ALJ'S DECISION

The ALJ issued a decision on August 10, 2020, concluding in relevant part:

> 1. The claimant last met the insured status requirements of the Social Security Act for a period of disability and disability insurance benefits of the Social Security Act on December 31, 2018. (Tr. 18).

> 2. The claim's date last insured for Medicare coverage is September 30, 2021. (Tr. 18).

> 3. The claimant has not engaged in substantial gainful activity since the alleged onset date on January 20, 2018 (20 CFR 404.1571 *et seq.*). (Tr. 18).

> 4. The claimant has the following severe impairments: intradural benign tumor of the lumbar spine at L2 with lumbar denervation and radiculopathy, status post (s/p) L2 laminectomy and resection of mass, and multilevel DDD of the lower thoracic spine (20 CFR 404.1520(c)). (Tr. 19).

> 5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). (Tr. 20).

> 6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a) and including the exertional abilities to lift, carry, push, and pull up to 10 pounds occasionally and 5 pounds frequently, to sit for a total of 6 hours in an 8-hour workday, and to stand or walk for a total of 2 hours in an 8-hour workday, except that he cannot operate foot controls bilaterally and is further limited as follows:
>    - Cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; can occasionally balance, stoop, crouch, kneel, and crawl; and
>    - Must avoid all workplace hazards such as unprotected heights or exposure to dangerous moving machinery. (Tr. 21).

> 7. The claimant is capable of performing past relevant work as an Archivist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). (Tr. 34).

Based on these findings, the ALJ determined that Ash had not been under a disability from January 20, 2018, through the date of the decision. (Tr. 37).

## V. LAW & ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at \*2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even

if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

## B. Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. **Discussion**

#### 1. *Separation of Powers Violation*

Ash argues that the ALJ's decision was constitutionally defective because the appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. For the reasons that follow, Ash's challenge to the constitutionality of the ALJ's decision lacks merit.

Initially, I note that Ash's complaint does not include any constitutional claims. (ECF Doc. No. 1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" A complaint need not provide "detailed factual allegations," but it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" Id. (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In his merit brief, Ash grounds his constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to make this claim when he filed his complaint in March 2021. Accordingly, his constitutional claim – advanced for the first time in his merit brief (ECF Doc. 15, PageID#696-98) – is procedurally improper. *See, e.g., Hawes v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-02848-DAR, 2022 WL 2346998, at *7 (N.D. Ohio Apr. 15, 2022), *report and recommendation adopted sub nom. Hawes v. Kijakazi*, No. 5:20-CV-02848, 2022 WL 2342642 (N.D. Ohio June 28, 2022).

Even if considered on its merits, however, Ash's constitutional claim fails. Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42

13

U.S.C. § 902(a). *See* Social Security Administration, Executive Bios, Andrew Saul, https://www.ssa.gov/ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited Dec. 9, 2022). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (ECF Doc. 15, PageID#696-97;ECF Doc. 17, PageID#726); *see also Seila Law LLC*, 140 S. Ct. at 2197 (statutory restriction on the President's ability to remove the head of an agency "for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional); *Collins v. Yellen*, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law*, the Supreme Court held that a statutory provision allowing the President to remove the Director of the Consumer Financial Protection Board ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court also found that the unconstitutional removal provision was severable from the other provisions of the relevant statute, thereby maintaining the CFPB intact as an agency. *Id.* at 2208, 2211. The Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. The Court, however, addressed this issue in *Collins v. Yellen*.

14

In *Collins*, the Supreme Court considered a similar statute similar to the one at issue in *Collins* governing the removal of Directors of the Federal Housing Finance Agency ("FHFA"). The Court held that, "[a]lthough the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

In *Collins,* the Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. *Id.* at 1788; *id.* at 1778 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-11) ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment"). Rather, to obtain reversal of an agency decision, a plaintiff would need to demonstrate "compensable harm" flowing from the unconstitutional removal clause. *Id.* at 1788-89. The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789.

Here, Ash claims he did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (*See* ECF Doc. 15, PageID#696-97). Additionally, Ash claims that "Mr. Saul implemented changes to HALLEX and new regulations which impacted

[him] and his application for benefits[,]" and he was harmed by "the modifications which were implemented during [Mr.] Saul's tenure as Commissioner." (*Id.* at PageID#697).

As in *Collins*, the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without Ash showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on him, remand for a *de novo* hearing is not available to him.

Moreover, Ash does not address the fact that the specific ALJ who presided over his case—Judge Shinn—was not appointed by a Commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* ECF Doc. 15, PageID#696-97). Because then-Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Then-Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (citing 12 U.S.C. § 4512(f)) (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because then-Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between then-Acting Commissioner Berryhill's ratification of Judge Shinn's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude that Ash has not shown that then-Acting Director Berryhill or Judge Shinn lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ").

Other federal courts in this judicial district, this state, and across the country, have also concluded that the appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis. Thus, even if Ash's constitutional claim was procedurally proper—which it is not—he has not articulated a specific, compensable harm that he sustained as a result of the unconstitutional removal provision in § 902(a)(3). As a result, Ash's first assignment of error lacks merit.

## 2. *Whether Ash's Impairments Meet or Equal a Listing*

### a. <u>Legal Standard</u>

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*,

482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

### b. **Listing 1.04**

The ALJ appropriately found that Ash did not meet his burden of satisfying all the criteria for spinal arachnoiditis[1] based on Listing 1.04(B). Listing 1.04 relates to "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. § 404, Subpart P, Appendix 1, § 1.04. In addition, the claimant must satisfy one of three criteria: (A) evidence of nerve root compression; (B) spinal arachnoiditis; and (C) lumbar spinal stenosis resulting in pseudoclaudication. *Id.* With respect to spinal arachnoiditis, Section 1.00K2b notes that the cause of arachnoiditis is not always clear as it may be associated with chronic compression or irritation of nerve roots (including the cauda equina) or the spinal cord. 20 C.F.R. § 404 Subpart P. App. 1, § 1.00K2b. Thus, the Social Security Administration cautions that the diagnosis must be confirmed "***at the time of surgery*** by gross description, microscopic examination of biopsied tissue, or by findings on appropriate medically acceptable imaging." *Id.* at §1.04 (emphasis added).

The Sixth Circuit regards Listing 1.04B as having "strict requirements" and "requires that a spinal arachnoiditis condition be confirmed by an operative note or tissue biopsy." *Lawson v. Comm'r of Soc. Sec.*, 192 Fed. App'x 521, 529-30 (6th Cir. 2006). And at least two courts in the Northern District of Ohio recognized that the elements of Listing 1.04B the claimant "was required to demonstrate" are: (1) compromise of a nerve root or spinal cord; (2) spinal arachnoiditis confirmed by acceptable imaging; and (3) a manifestation of severe burning or painful dysesthesia resulting in the need for changes in position or posture more than once every 2 hours." *Martin v.*

---

[1] Spinal arachnoiditis is "a condition characterized by adhesive thickening of the arachnoid which may cause intermittent ill-defined burning pain and sensory dysesthesia, and may cause intermittent dysesthesia, and may cause neurogenic bladder or bowel incontinence when the cauda equina is involved." 20 C.F.R. Pt. 404, Subpt, P, App.1, § 1.00K2a.

*Comm'r of Soc. Sec.*, No. 3:19cv00005, 2018 WL 6169282, at *10 (N.D. Ohio Nov. 26, 2018); *Chopka v. Saul*, No. 5:18cv945, 2019 U.S. Dist. LEXIS 145563, at *9-10 (N.D. Ohio Aug. 27, 2019).

Here, Ash contends that the ALJ committed reversible error by failing to find that Ash had spinal arachnoiditis. (ECF Doc. 15, PageID#700). Ash asserts that he has produced evidence to meet Listing 1.04(B) applicability. For example, he notes that on June 14, 2010, he met Dr. Dorfman regarding his lumbar spine area, and Dr. Dorfman observed that Ash: (1) was ambulating with a cane held in the right upper extremity; (2) had a healed scar midline in the thoracic region from a prior fusion; and (3) and had radiculopathy in the lumbar region. (*Id.* (citing Tr. 244, 246, 49)). Ash also notes that during his August 6, 2018, appointment that he experienced numbness and tingling. (*Id.* (citing Tr. 249)). He further states that a review of his July 2018 MRI revealed an intradural extramedullary mass at L2 with multilevel degenerative disc disease and spondylotic change, along with a left-sided disc protrusion at L5/21 with foraminal narrowing and contact with the descending S1 nerve root. (*Id.* (citing Tr. 249-50, 259-60)). Ash also points to a follow-up note dated November 1, 2019, where Dr. Hartzfeld indicated that "there is a small degree of expected arachnoiditis given his history" based on his review of Ash's postoperative MRI. (*Id.* (citing Tr. 504)). Based on this evidence, Ash contends that the ALJ erred in concluding that Ash had not met Listing 1.04.

The Commissioner contends that the ALJ carefully articulated his Step Three findings. (ECF Doc. 17, PageID#739). Specifically, the Commission reiterates that the ALJ found that there was no nerve root compromise on imaging, and physical examinations did not show clinical evidence of nerve root compromise or the inability to ambulate effectively. (*Id.* (citing Tr. 20, 21)). With respect to a specific finding of arachnoiditis, the Commissioner contends that the ALJ had

"explicitly mentioned" the doctor's note and explained that the introductory language of the listing cautions that a diagnosis is sometimes used without laboratory support. (*Id.* (citing Tr. 20-21, 504)). Moreover, the Commissioner asserts that the ALJ determined that Ash's imaging and biopsy failed to show a diagnosis of arachnoiditis. (*Id.* (citing Tr. 21, 290, 559-61)). Accordingly, the Commissioner concludes that the ALJ correctly determined that Listing 1.04(B) had not been met.

The ALJ analyzed the first element and concluded that Ash had not met Listing 1.04 at any relevant point since the alleged onset date. (Tr. 20). First, the ALJ stated that the results of his March 20, 2018, x-rays, as well as his July 25, 2018 and August 20, 2018 MRIs of Ash's lumbar spine, did not reveal the required presence of nerve root compromise (including the cauda equina) or of the spinal cord. (*Id.*). Next, the ALJ found that Ash's October 23, 2019 postoperative MRI had also not shown any compromise at the lumbar spine. (*Id.*).

The ALJ then analyzed whether Ash's impairments met or medically equaled Listing 1.04B, engaging in the following analysis:

> In terms of Listing 1.04B for spinal arachnoiditis, I did consider the potential applicability of this subsection and severity criterion because it was mentioned by the claimant's neurosurgeon in a November 1, 2019 follow-up note and after he had reviewed the postoperative MRI (Ex. 10F/3). Specifically, he noted "a small degree of expected arachnoiditis given his history." However, section 1.00K2b cautions adjudicators that, seemingly as was done here, arachnoiditis is sometimes used as a diagnoses without support in clinical or laboratory findings and, as such, requires that care be taken to ensure that the diagnosis is confirmed at the time of a surgery by gross description, by microscopic examination of biopsied tissue, or by findings on appropriate medically acceptable imaging. While full consideration was extended to the report of October 12, 2018 laminectomy and resection of the intradural mass at L2 (Ex. 12F/46-48) and to the pathology biopsy study (Ex. 2F/25-27), these laboratory studies do not show the diagnosis of arachnoiditis and, thus, Listing 1.04B cannot be met.

Here, Ash contends that subsection B's requirement of "appropriate medically acceptable imaging," which confirms the existence of spinal arachnoiditis, was met by Dr. Hartzeld's notation that his postoperative MRI revealed a small degree of expected arachnoiditis. (Tr. 504). However,

as the ALJ noted, the diagnosis was insufficient, and instead must be confirmed by specific tests dictated by Listing 1.04. Specifically, the ALJ looked at laboratory findings at the time of Ash's surgery, including the report of his October 12, 2018 laminectomy and resection of the intradural mass at L2 (Tr. 559-61), as well as the October 19, 2018 pathology biopsy study (Tr. 290-92). Indeed, as the ALJ noted, neither Ash's October 12, 2018, laminectomy and resection of the intradural mass at L2 report, nor his October 19, 2018, pathology biopsy study, diagnosed him with spinal arachnoiditis.

Accordingly, Ash has failed to identify sufficient evidence to demonstrate that he could reasonably meet or equal every requirement of Listing 1.04.

### c.  **Listing 11.08**

Listing 11.08 addresses spinal cord or nerve root lesions. To meet or equal this Listing, Ash was required to satisfy the criteria under one of the following sections:

> A. Complete loss of function, as described in 11.00M2, persisting for 3 consecutive months after the disorder; or
>
> B. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or the use of upper extremities persisting for 3 consecutive months after the disorder (see 11.00M4); or
>
> C. Marked limitation (see 11.00G2) in physical function (see 11.00G3a) and in one of the following areas of mental functioning, both persisting for 3 consecutive months after the disorder (see 11.00M4):
>
>> 1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
>>
>> 2. Interacting with others (see 11.00G3b(ii)); or
>>
>> 3. Adapting or managing oneself (see 11.00G3b(iv).

20 C.F.R. Part 404, Subpart P, Appendix 1.

Sections 11.00D1 and D2 further define "disorganization of motor function," providing:

22

1. Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities; *i.e.*, the lower extremities, or upper extremities (including fingers, wrists, hands, arms, and shoulders). By two extremities, we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity.

All listings in this body system [with exceptions not pertinent here] include criteria for disorganization of motor function that results in an extreme limitation in your ability to:
      a.  Stand up from a seated position; or
      b. Balance while standing or walking; or
      c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders)

2. Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. The assessment of motor function depends on the degree of interference with standing up; balancing while standing or walking; or using the upper extremities (including fingers, hands, arms, and shoulders).

a. Inability to stand up from a seated position means that once seated you are unable to stand up and maintain an upright position without the assistance of another person or the use of an assistive device, ***such as a walker, two crutches, or two canes***.

b. Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, ***such as a walker, two crutches, or two canes***.

c. Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. Inability to perform fine and gross motor movements could include not being able to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00D (emphasis added).

The ALJ concluded that Listing 11.08 did not apply to Ash for the following reasons:

23

> Since the claimant did have a benign mass on the spinal cord per the preoperative MRIs and since the intraoperative description noted that the mass was "growing off" one nerve root (*see* Ex. 12F/47), I have also considered Listing 11.08 for a neurological disorder of the spinal cord. However, that listing is not met because the mass did not result in "complete loss of function," or in disorganization of two extremities with an "extreme" limitation in the (relevant) specific motor abilities to stand up from a seated position or to balance while standing or walking, or a "marked" limitation in specific and supportive motor functioning and a similar degree of limitation in one or more broad areas of mental functioning.

(Tr. 21).

Ash contends that he met the required criteria for Listing 11.08. (ECF Doc. 15, PageID#700). He states that, at the time of his surgery, it was noted that there was a mass growing off a nerve root. (*Id.* (citing Tr. 560)). Next, he asserts that his treating neurosurgeon noted, one year after surgery, that Ash still had neuropathic pain his lower extremities. (*Id.* (citing Tr. 503)). Ash contends that he continued to have diminished lower extremity motor strength on his left side. (*Id.* (citing Tr. 504, 507). Because Ash had disorganization of motor function resulting in an extreme limitation in the ability to balance while standing or walking, while using a cane, he contends that the ALJ erred in finding he did not satisfy the listing's requirements. (*Id.*).

The Commissioner contends that the ALJ "carefully considered" Listing 11.08 by explicitly referencing the mass "growing off" one nerve root in the record. (ECF Doc. 17, PageID#739) (citing Tr. 21, 560)). Accordingly, the Commissioner asserts that the ALJ reasonably concluded that Ash did not meet the listing because there was no evidence of the mass resulting in a complete loss of function or disorganization of two extremities, or of "marked" limitations in mental functioning. (*Id.* (citing Tr. 21)).

Here, Ash has provided a cursory analysis regarding Listing 11.08 but fails to define *what* "disorganization of motor function" is or explain *how* his cited evidence qualifies as such. (*See* ECF Doc. 17, PageID#739)  It is well-established that "issues adverted to in a perfunctory manner,

24

unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul*, No. 1:19-cv-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

To the extent that this argument was not waived, it is without merit. While Ash does point to certain record evidence that may be relevant to the Listing, a broad reading of this record evidence does not support a finding of "extreme limitations" as defined in Section 11.00D2. An extreme limitation with respect to "disorganization of motor function" in the lower extremities under Listing 11.08 refers to limitations in standing and walking that require the use of a walker, two crutches, or two canes. Ash's alleged use of a single cane cannot support a finding of an "extreme limitation" in balance while standing or walking. Ash fails to point to any treatment records to remedy this deficiency. *See Weir v. Comm'r of Soc. Sec.*, Case No. 5:21cv1117, 2022 WL 3219518, at *16 (N.D. Ohio July 6, 2022) (rejecting claimant's assertion that use of a single cane qualified as an "extreme limitation" under Section 11.00D2 to satisfy the criteria of Listing 11.09), *report and recommendation adopted*, 2022 WL 3220864 (N.D. Ohio Aug. 9, 2022). Because Ash has not identified specific record evidence demonstrating that he could have reasonably met or equaled every element of Listing 11.08, the ALJ did not commit reversible error with this Listing at Step Three.

### d.  Error in Not Evaluating Pain Symptoms

Next, Ash argues that the Commissioner's decision should be reversed because the ALJ did not consider whether his back pain was a disabling impairment. Ash asserts that the ALJ erred by concluding that the records after the surgery were not entirely consistent with the full extent of

his allegedly debilitating pain during the portion of the relevant period. (ECF Doc. 15, PageID#701). Ash further contends that, after his October 2018 surgery, all the medical sources documented his continuing complaints of back pain. (*Id.* at 701-02 (citing Tr. 466-70, 503-04, 506-07). He further points to his treating neurosurgeon's postoperative note indicating that he had expected arachnoiditis. (*Id.* at 702 (Tr. 504)). Citing to *Jones v. Sec'y Health and Human Servs.*, 945 F.2d 1365 (6th Cir. 1991), Ash asserts that the ALJ failed to consider the pain as supported by the objective medical findings, and as such this matter should be reversed and remanded. (*Id.*).

Ash's argument is internally inconsistent. At one point, he asserts that the case should be remanded to "consider whether the effects of his pain symptoms would interfere with his ability to perform his past relevant work as an Archivist." (ECF Doc. 15, PageID#702). Thus, he appears to be framing his argument relating to pain in terms of whether, if his complaints were properly credited, the RFC should have been more restrictive. Yet on the other hand, he asserts that this a Step Two issue because the ALJ failed to consider his pain as supported by the objective medical findings.

Under the pertinent regulations, pain is considered a symptom of an underlying impairment going to the severity of the impairment and is not itself an impairment, which, if underlying criteria are met, would render the claimant disabled. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *see also Lynch v. Comm'r of Soc. Sec.*, No. 1:21-cv-00566-JDG (N.D. Ohio March 2, 2022) ("The Commissioner will not, however, find an individual to be disabled based on alleged symptoms.").

When a claimant asserts a disabling symptom such as pain, the ALJ follows a two-step process for evaluating that allegation. *Massey v. Comm'r of Soc. Sec.*, 409 F.App'x 917, 921 (6th Cir. 2011). First, the ALJ determines if the claimant has a medically determinable impairment that

could reasonably be expected to produce the alleged symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1). At this second stage, the ALJ may consider the testimony of the witness, or evidence gleaned from other medical and non-medical sources. 20 C.F.R. § 404.1529(c)(1). The ALJ will also consider a claimant's daily household, personal, and social activities when evaluating an assertion of pain or other symptoms. *Walters*, 127 F.3d at 532.

The ALJ is not required to accept the claimant's subjective complaints and may discount the claimant's testimony when the ALJ deems it consistent with the objective evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). The ALJ's decision, however, must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words" in articulating this finding, so long as it is clear from the decision taken as a whole as to why the ALJ reached the particular conclusion. *Wilson v. Kijakazi*, No. 5:20-cv-02414, 2022 WL 4616979, at *7 (N.D. Ohio Sept. 30, 2022).

An ALJ's finding on the credibility of subjective evidence receives great deference on judicial review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent a compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, nor the conclusions drawn therefrom. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18cv0098, 2019 WL 1282105, at *2 (N.D. Ohio March 20, 2019).

Here, the ALJ initially stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." (Tr. 21). The

ALJ then recited the required two-step evaluation process set forth above and noted Plaintiff's pain

complaints. (Tr. 22-23). The ALJ subsequently acknowledged that Ash's medically determinable

impairments could be expected to cause the symptoms alleged, but then found Ash's statements

as to the intensity, persistence, and limiting effects of those symptoms was not consistent with the

evidence. (Tr. 24-29).

The ALJ addressed Ash's testimony about his pain and daily activities. (Tr. 22-23). He

then considered the medical evidence relating to his alleged back pan and pain traveling down his

left lower extremity, citing to some of the following record evidence:

- July 2018 MRI rating degree of multilevel DDD and spondylosis as "mild," the
  multilevel foraminal stenosis as "mild to moderate," and the sole level of central
  canal stenosis at L4-L5 as "mild";

- 
- The August 2018 nerve conduction study revealing normal motor and sensory
  latencies;

- Dr. Dorfman finding no focal motor deficits in the bilateral lower extremities or
  any reproduced discomfort on movements of the hips, knees, and ankles and absent
  nerve-root tension signs on seated straight-leg raising test;

- Improved back pain level and increased motor strength over the course of physical
  therapy;

- Ash's complaints of a tingling sensation in his left leg and weakness in the left foot,
  pain with standing and difficulty sitting without increased low back pain at his
  neurosurgeon's office;

- Dr. Hartzfeld's physical examination results recording 4/5 strength in his left lower
  extremity but full 5/5 strength in his right lower extremity, decreased lumbar spinal
  range of motion, and intact (but ranged at 1-2+) deep tendon reflexes in both lower
  extremities;

- October 2019 MRI revealing only "expected" postoperative changes related to
  Ash's laminectomy and resection of his underlying spinal canal mass with no
  drainable fluid collection and unchanged degenerative disc disease.

(Tr. 23-28).

Finally, the ALJ addressed the medical opinions of the state agency consultants, opining that the experts' shared findings were not persuasive because they made their findings solely based on evidence through Ash's DIB date last insured. As such, the ALJ concluded that the state agency consultants did not fully consider the available medical evidence after the end of 2018 when reaching their findings. (Tr. 31-32). The ALJ noted, however, the consultants' findings that Ash's use of a cane is not medically required to support longer periods of standing and walking, and that Ash's spinal disorders did not meet or medically equal a listing, to be persuasive, because they were supported by reviews of the available medical evidence extending through the DIB date last issued and Ash's postoperative course of therapy. (Tr. 32). The ALJ also found Dr. Mason's medical opinion that Ash had functional limitation in his abilities to sit or to stand for longer than one minute continually, to sit for less than two total hours, and to stand and/or walk for less than two total hours, to be unpersuasive. (Tr. 32-33).

Accordingly, the ALJ applied the appropriate legal analysis to his articulated findings and supported these findings with substantial evidence.

### e.  The ALJ's Evaluation of Ash's Combination of Impairments

Finally, Ash argues that the Commissioner's decision should be reversed because the ALJ did not conduct sufficient analysis regarding the combined effect of Ash's physical impairments and whether they supported the ALJ's decision finding that he could return to his past relevant work. (ECF Doc. 15, PageID#703). Yet, Ash fails to explain *how* or point to objective evidence in the record when making his argument. (*See* ECF Doc. 15, PageID#703). This argument is undeveloped and therefore deemed waived. Even if not waived, his argument is without merit. The Sixth Circuit has stated that ""[a]n ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ

specifically refers to a 'combination of impairments' in finding that plaintiff does not meet" a listed impairment." *Hill v. Comm'r of Soc. Sec.*, 560 Fed. Appx. 547, 551 (6th Cir. Mar. 27, 2014) (quoting *Ly v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)). The ALJ considered Ash's physical impairments, as well as the combination of those impairments, when evaluating his disability claim and assessing his RFC. (Tr. 20-21). Elsewhere in the opinion, the ALJ also determined that the imaging and the other laboratory diagnostic studies substantiated the existence of medically determinable impairments of degenerative disc disease of the lumbar spine and lower spine, as well as the spinal cord tumor at the L2 level that was surgically removed in October 2018. (Tr. 24). Yet, the ALJ concluded that the symptoms and associated medical signs were not entirely consistent with the full extent of Ash's reported pain during the portion of the relevant period. (Tr. 24-25). Accordingly, I recommend that the Court reject Ash's assignment of error.

### 3. *SSR 16-3p: Credibility Analysis*

Ash's next assignment of error is that the ALJ erred in his credibility analysis pursuant to SSR 16-3p. He makes two sub-claims: (1) the ALJ erred by finding Dr. Mason's opinions unpersuasive; and (2) the ALJ erred by finding Ash's wife's Third-Party Function Report unpersuasive.

### a. <u>Legal Standard</u>

In determining whether a claimant is disabled, the ALJ considers all of the claimant's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective evidence in the record. SSR 16-3P, 2017 WL 5180304, at *2. The ALJ is required to use a two step-process. *Id*. at *3. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce

the individual's alleged symptoms. *Id.* Second, the ALJ evaluates the intensity, persistence, and limiting effects of a claimant's symptoms. *Id.* at *4. In so doing, the ALJ should consider the evidence provided and, when relevant, seven factors listed in SSR 16-3p. The factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or symptoms; (5) treatment other than medication for the relief of pain or symptoms; (6) any other measures used to relieve pain or symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain and other symptoms. Id. at *7–8. The ALJ need not discuss all seven factors but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

A claimant's subjective complaints "can support a claim for disability[ ] if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). An ALJ, however, "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, [the ALJ] will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304, at *8.

The ALJ's determination of credibility is given "great weight" because he, unlike the Court, has the opportunity to observe the claimant's demeanor while testifying. *Jones*, 336 F.3d at 476

(citations omitted). However, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so.").

### b. Persuasiveness of Dr. Mason's Opinion

To support his sub-claim, Ash points to Dr. Mason's June 12, 2020 Physical Medical Source Statement, which stated that Ash: (1) had back pain with radiculopathy, lipoma of back, and restless leg; (2) had low back pain radiating into his buttock and extending down to the back of his leg, resulting in weakness; (3) had medication side effects of blurred vision and poor balance; (4) could sit and stand/walk less than two hours each; (5) would need to walk around due to muscle weakness and pain and numbness; (6) needed a cane; (7) was limited to rarely lifting and carrying less than 10 pounds; (8) would be off task 25% of the time, and was incapable of even low stress work; and (9) that all his days were bad. (ECF Doc. 15, PageID#705 (citing Tr. 510-13). Although the ALJ concluded that Dr. Mason's report was greatly inconsistent with the collateral medical evidence from Ash's physical therapist and with the full extent of the Ash's daily activities, Ash argues that other record evidence supports his sub-claim. For example, Ash points to his April 8, 2019 physical therapy notes, which indicated the following: (1) that he was restricted to activities within his pain tolerance; (2) his goal was to get stronger and return to work; (3) that he did use his cane at times and reported an increase in pain and felt weak; (4) he had improved but did not meet his goals; and (5) that there was no change in his range of motion, pain level, or mobility. (*Id.* at 706 (citing Tr. 343-45)). Ash also points to Dr. Hartzfeld's notes stating that: (1) Ash

reported burning in his lower back and left leg, resulting in difficulty sitting and standing with use of a cane due to weakness in his leg; and (2) Ash's left lower extremity was tingling weak foot and was ambulating with a cane. (*Id.* (citing Tr. 504)).

Based on this evidence, Ash contends that the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether his testimony was consistent with his symptoms. He asserts that the "ALJ failed to articulate any rationale beyond the boilerplate paragraph." (*Id.* (citing Tr. 23, 31)). Accordingly, Ash argues that the ALJ did not comply with the requirements of SSR 16-3p due to insufficient analysis.

The Commissioner contends that the ALJ reasonably found that Dr. Mason's opinion was unpersuasive. (ECF Doc. 17, PageID#743). The Commissioner asserts that the ALJ aptly pointed out that Mason' opinion was vague and not supported by objective evidence. (*Id.* (citing Tr. 33)). The Commissioner contends that the ALJ reasonably pointed out that Mason's opinion echoed Ash's own subjective complaints. (*Id.*). The Commissioner also argues that the Commissioner correctly determined that Dr. Mason's statement that Ash was "incapable of working" was an issue reserved to the Commissioner. (*Id.*). Further, the Commissioner contends that Ash's argument that the ALJ used boilerplate to reject Dr. Mason's opinion is unconvincing, and cites to provisions of the decision where the ALJ discusses Mason's opinion. (*Id.* at 744 (citing Tr. 33)). Finally, the Commissioner asserts that Ash's arguments overall are an improper demand for this Court to review the evidence to reach his preferred conclusion. (*Id.*). Accordingly, the Commissioner argues that the ALJ's decision should be affirmed. (*Id.* at 746).

Although Ash asserts that the ALJ only addressed the persuasiveness of Mason's opinion through a "boilerplate paragraph," the record reveals that this claim is inaccurate. First, as the ALJ correctly determined, Dr. Mason's determination that he was "incapable" of working was an issue

reserved for the Commissioner. (Tr. 33). The Sixth Circuit has held that opinions regarding the ultimate issue of disability is not a "medical opinion" because that determination is reserved for the Commissioner. *Bass v. McMahon*, 449 F.3d 506, 511 (6th Cir. 2007) ("[T]he conclusion of disability is reserved to the Secretary[.]"); *Tharp v. Comm'r of Soc. Sec.*, Case No. 1:21-135, 2022 WL 2195056, at *23 (N.D. Ohio April 11, 2022). Setting aside Dr. Mason's improper opinion, substantial evidence exists in the record to support the ALJ's conclusion that Dr. Mason's opinion was unpersuasive.

For example, the ALJ cited to Ash's 2018-2019 physical therapy records to support his assertion that Dr. Mason's opinion regarding Ash's weakness, need to use a cane, and extreme limitations in sitting and standing/walking abilities was unpersuasive. These physical therapy notes reflected increased improvement in Ash's lower extremities and improvement in the lumbar spine. For example, Ash was hospitalized after his October 2018 surgery. The report indicated that Ash walked well with a straight cane, and physical examination on his date of discharge revealed full 5/5 motor strength in the bilateral extremities. (Tr. 516, 543, 544). During the first two months of his postoperative physical therapy, Ash reported reduced pain to 5/10 (moderate intensity) and demonstrated fair exercise tolerance. (Tr. 403, 399,394). At a progress update on January 7, 2019, Ash displayed improved strength in his lower extremities. Specifically, Ash displayed full 5/5 muscle strength throughout his lower extremities except for slightly reduced (4+/5) graded strength in his left knee and left hip flexors; (2) demonstrated moderately limited range of motion at the lumbar spine; and (3) reported pain as mostly moderate (5/10 to 6/10). (Tr. 381-83). Over the course of 17 visits through March 11, 2019, Ash showed more gains, reporting stability and even reduction in pain intensity to 4/10 (low moderate). (*See* Tr. 379, 378, 373, 365, 363, 363, 359). He

also no longer ambulated with a cane and demonstrated improved gait pattern and posture. (*See id.*).

On March 11, 2019, Ash's second reassessment revealed that he demonstrated additional improvement in range of motion at the lumbar spine, though he did not meet goals for full improvement. (Tr. 355-58). He showed full 5/5 strength throughout all muscle groups of his bilateral lower extremities, ambulated without his cane, and reported moderate pain level (5/10). (Tr. 356). Over the last month of physical therapy sessions through April 8, 2018, Ash did not present with the cane when walking in the sessions, he showed improvement in his trunk flexion to full 5/5, and he still reported no more than moderate pain intensity level at 4/10 to 5/10. (Tr. 352, 349, 346, 343-45). By the end of his formal physical therapy, Ash continued to demonstrate full strength in both lower extremities and had 68% of his full lumbar range of motion. (*Id.*).

The ALJ also determined that Ash's self-reported daily activities were inconsistent with Mason's opinion. These self-reported daily activities included: driving, running errands for his elderly mother at least once a week but according to his wife's written statement, a few times a week; riding a motorcycle; and in-home activities such as preparing meals, washing dishes, and mopping floors. (*See, e.g.*, Tr. 238).

Ash's arguments and citations to the record ignore the substantial evidence standard. While there is evidence in the record that *may* lead to a different conclusion, the ALJ presented substantial evidence to support his conclusion. Ash's disagreement with the ALJ's interpretation of the evidence is not a basis for reversal. "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being

second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). Here, the substantial evidence presented by the ALJ reasonably supported his conclusion. Accordingly, I recommend that the Court reject this portion of Ash's assignment of error.

### c.   Persuasiveness of Wife's Third-Party Function Report

Ash also contends that the ALJ erred by finding that Ash's wife's June 18, 2020 Third-Party Function report was unpersuasive. (ECF Doc. 15, PageID#707). Ash asserts that his wife reported that: (1) he had only a short window of being able to sit before he had to stand and walk around or recline; and (2) he could only stand for a short period of time. (*Id.* (citing Tr. 236)). Moreover, Ash asserted that his wife stated that he began using a cane prior to his tumor removal, but the doctor did not oppose Ash's use of a cane. (*Id.* (citing Tr. 242)). He argues that the ALJ's conclusion that the Function Report was unpersuasive was not supported by supportable rationale, which is harmful error that merits a remand. (*Id.*).

The Commissioner asserts that the ALJ provided legally valid and factually supported reasons for rejecting Ash's claims, as well as his wife's reports of disabling symptoms and limitations. (ECF Doc. 17, PageID#748 (citing Tr. 29-30, 236-43).

The ALJ stated the following regarding Ash's wife's Third Party Function Report:

Finally, I have considered the July 2020 responses to the Function Report from the claimant's wife as evidence from a "nonmedical source" (20 CFR 404.1513(a)(4)). Here, while regarding Mr. Ash's statement that his wife happens to be a nurse at a pain-management facility, she is not his "own medical source" or reviewed his medical records, and the nature of her information relates to his daily activities. Mrs. Ash stated that her husband has a "short window" of being able to sit for 15 to 20 minutes before he needs to stand up and either walk around or recline, that standing is more limited by low back and leg pain to 5-10 minutes, and that he can only recline or lie down to alleviate increased pain after standing this very limited duration, and that he continues to use the cane when going out into public to provide stability and to take strain off the affected (left) leg. (Ex. 12E/1,2,6,7). Mrs. Ash all but confirmed that the cane has not been prescribed but related that his physician

prior to the surgery, "didn't see any problems with this," and she stated that his strength has not restored and his pain, though not as debilitating, has continued since the October 2018 surgery. (Ex. 12E/8).

While it is notable that her statements about his sitting tolerance is greater than his allegedly extreme limitation in testimony, Mrs. Ash's statements are simply not consistent with the preponderance of the medical observations made by the physical therapist and physicians and with the other medical factors discussed above.

(Tr. 31).

Ash's contention that the ALJ did not articulate supportable rationale for his conclusion that his wife's function report was unpersuasive is not well-taken because there is substantial evidence in the record to support the ALJ's conclusion. As stated above, the ALJ relied on several physical therapy records to conclude that the severity of symptoms was inconsistent with those alleged by Ash. The physical therapy records, discussed at length above, reported that Ash had increased strength in his lower bilateral extremities, increased motion in the lumbar spine area, and the ability to ambulate without a cane. Moreover, at the time his therapy ended in April 2019, Ash even reported that he was bringing his cane with him but was not using it when he went on walks, and he only reported difficulty ambulating up and down hills. (Tr. 343). Furthermore, as also discussed above, Ash's reported daily activities were inconsistent with his allegedly extreme limitations. Specifically, in his early postoperative period, he told his physical therapist that he was walking more, doing dishes, pulling laundry out of the washing machine, and doing more around the house.

Here, the ALJ considered the evidence in the record, including evidence that Ash now points to in support of his claim, but did not find Ash's allegations entirely credible. It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Ash has not shown that the

ALJ's assessment of his subjective complaints is unsupported by substantial evidence. Accordingly, reversal is not warranted. *Jones*, 336 F.3d at 447.

### d. Overall Credibility 16-3p Analysis

Finally, to the extent that Ash attempts to allege that the ALJ overall erred in his SSR 16-3p analysis, this claim should be rejected. With respect to location, duration, frequency, and intensity of pain or other symptoms, the ALJ addressed Ash's physical complaints and pain allegations, but stated that his physical examinations had normal findings. (Tr. 24 (citing Tr. 246, 249, 259)). Furthermore, the ALJ discussed that Ash reported medication side effects that include blurred vision, dizziness, weight gain, and increased irritability. (Tr. 29). Yet, the ALJ also found that there were times that Ash did not report any adverse medication side effects. (Tr. 29, 503, 506). Moreover, the ALJ highlighted that, while Ash complained that his medication was causing problems, the dosage of his medication was recently increased. (Tr. 29, 613-17). The ALJ even considered Ash's alleged need for a cane, but the ALJ determined that, during the course of successful physical therapy, Ash no longer used the cane and demonstrated improved gait and posture. (Tr. 26, 343, 359-79).

The ALJ also determined that Ash's daily activities were inconsistent with his complaints. (Tr. 30). Although the ALJ acknowledged that Ash reported he could not work because he had back pain and needed a cane, the ALJ also noted that Ash and his wife reported that he was able to drive, do dishes, mop floors, help his elderly mother, ride a motorcycle, prepare simple meals, and do some limited aspects of laundry chores. (Tr. 29-30, 236-43, 349, 353, 365, 378, 394, 403, 424). The ALJ also considered Ash's medical examinations and pain. For example, the ALJ cited to Ash's July 2018 MRI and his August 2018 NCS. (Tr. 24, 244, 447-49). Thus, Ash has failed to demonstrate that the ALJ did not consider the criteria under 20 C.F.R. § 404.1529(c)(2),(3).

Finally, in evaluating Ash's allegations, the ALJ reviewed the objective evidence in light of Ash's subjective complaints. Specifically, as the Commissioner points out, the ALJ even acknowledged the abnormal objective imaging, abnormal range of motion, and abnormal gait. (Tr. 24). Ash's assertion that the ALJ "erroneously did not build an accurate logical bridge between the evidence documenting Ash's disabling problems and the ALJ'S decision to deny benefits" ignores the extensive analysis the ALJ devoted to this issue. (*See generally* Tr. 23-34).

In sum, I find that Ash has not shown that the ALJ ignored evidence when assessing Ash's subjective allegations. Nor has he shown that the ALJ's assessment of his subjective allegations is not supported by substantial evidence. Thus, I recommend that the Court reject Ash's assignment of error and find that reversal and remand is not required for further assessment of Ash's subjective allegations.

### 4. *Step Four: Assistive Device Limitation*

#### a.  <u>Parties' Arguments</u>

In Ash's final assignment of error, he argues that the ALJ erred at Step Four when he found that Ash could still perform his past work as an Archivist. (ECF Doc. 15, PageID#708-09). Ash asserts that there is evidence in the record that indicates he could not return to his past work. (*Id.* at 708). He cites to the VE's testimony that a hypothetical person needing a cane would preclude one's ability to perform one's past work activity as an archivist. (*Id.*). He also cites to Dr. Dorfman's June 2018 observation that Ash walked with a cane; Dr. Mason's assessment that Ash needed a cane due to imbalance, pain, weakness and insecurity; and physical therapy notes that he used a cane and reported an increase in pain and felt weak. (*Id.* at 709 (citing Tr. 246, 344, 503, 512)). Based on this evidence, Ash argues that the ALJ erred in failing to include the need for a

cane in his RFC. (*Id.*). Thus, he asserts that the ALJ's Step Four finding was not supported by substantial evidence. (*Id.*).

The Commissioner maintains that the ALJ properly relied upon the testimony of the VE in making a Step Four determination in Ash's case. (ECF Doc. 17, PageID#749). He contends that Ash "mistakenly" argues at this stage that the VE stated that the work could not be performed if Ash needed a cane. (*Id.*). Rather, the Commissioner asserts that Ash's argument attacks whether the ALJ's residual functional capacity ("RFC") determination is supported by substantial evidence, *not* whether substantial support exists for the ALJ's Step Four finding. (*Id.*). The Commissioner states that a hypothetical question is not improper merely because it does not include all of Ash's alleged impairments. (*Id.*). Instead, the ALJ, as the Commissioner contends, is only required to incorporate those limitations he accepted as credible. (*Id.*) (citing *Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Salyer v. Comm'r of Soc. Sec.*, 574 F. App'x 595, 596 (6th Cir. 2014)).

### b. <u>Legal Standard</u>

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920)(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio Jan. 18, 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5)). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Generally, for an assistive device to be considered a restriction or limitation, there must be sufficient evidence in the record to compel the ALJ to conclude that the device is "medically

necessary," based on a showing that it is "more than just a subjective desire on the part of the plaintiff" to use it. *See Murphy v. Astrue*, No. 2:11-CV-00114, 2013 U.S. Dist. LEXIS 30492, at *28 (M.D. Tenn. Mar. 6, 2013) (internal citations omitted). Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device, but the ALJ did not include the use of the device in the RFC finding, and did not explain the omission. *Cruz-Ridolfi v. Comm'r of Soc. Sec.*, No. 1:17-CV-1075, 2018 U.S. Dist. LEXIS 32651, at *43 (N.D. Ohio Feb. 12, 2018). However, for an ALJ to find an assistive device medically necessary, there must be medical documentation establishing the need for the device to aid in walking or standing, and documentation "describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distances and terrain; and any other relevant information)." SSR 96-9p, 1996 SSR LEXIS 6, at *20.

### c.  Analysis

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in not including a specific limitation for an assistive device in his RFC findings. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.

Ash's citations to Dr. Dorfman's report (Tr. 246), Ash's physical therapy notes (Tr. 344), and Dr. Hartzfeld's remarks (Tr. 503) are unavailing. These record citations are not medical documentation demonstrating he required the use of a cane, much less that it was prescribed. With respect to Dr. Dorfman's report, it merely contained an observation that Ash ambulated into the exam room with a cane. (*See* Tr. 246 ("On exam, Mr. Ash is a 55-year old gentleman ambulating into the exam room with a straight cane in the right upper extremity.")). Similarly, Ash's physical therapy notes simply state that Ash reported sometimes using a cane. (*See* Tr. 344 ("[Ash] [r]eports ambulating community distances. Uses cane at times, and carries cane at other times.")). Finally,

Dr. Hartzfeld's remarks are a reiteration of Ash's own subjective report regarding his use of a cane. (*See* Tr. 503 ("Patient returns today to review his MRI reports…utilizing cane because he feels weak in his leg[.]"). Significantly, numerous courts in this district have recognized that "indications in the medical records that Plaintiff was using a cane [are] insufficient to establish that the cane was medically required." *Stupka v. Saul*, No. 1:19-cv-2305, 2021 WL 508298, at *3 (N.D. Ohio Feb. 11, 2021) (quoting *Parrish v. Berryhill*, No. 1:16-cv-1880, 2017 WL 2728394, at *12 (N.D. Ohio June 8, 2017), *report and recommendation adopted sub nom.*, *Parrish v. Comm'r of Soc. Sec.*, 2017 WL 2720332 (N.D. Ohio June 23, 2017)); *see also Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *18-20 (N.D. Ohio Dec. 12, 2018) (rejecting similar evidence as insufficient under SSR 96-9p), *report and recommendation adopted sub nom.*, *Golden v. Comm'r of Soc. Sec.*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019).

Regarding Dr. Mason's opinion regarding Ash's need for a cane, the ALJ did not err by failing to include this specific limitation for an assistive device in his RFC. In the ALJ's decision, he acknowledged Dr. Mason's opinion regarding Ash's need for a cane. The ALJ concluded that Dr. Mason's opinion was "highly inconsistent" with Ash's physical therapy records in 2018 and 2019, which included significant improvement to full 5/5 muscle strength in both lower extremities and range of motion at the lumbar spine. Moreover, the ALJ noted that at several visits Ash was observed ambulating independently and without the use of the cane. The record evidence supports the ALJ's finding. After Ash's October 2018 surgery, he was hospitalized. He reported walking well with a straight cane. His physical examination revealed full 5/5 motor strength in the bilateral extremities, which was an improvement from his 4/5 strength graded the day before his date of discharge and the day immediately after his surgery. (Tr. 516-18, 542, 544). A January 7, 2019, progress update indicated that Ash displayed full 5/5 muscle strength throughout the lower

42

extremities except for slightly reduced (4/+5 graded strength) in the left knee and left hip flexors. He also reported pain as mostly moderate self-rate at 5/10 to 6/10. (Tr. 381-83). Ash then demonstrated more progress, reporting stability and some reduction in pain intensity to low-moderate 4/10 during the course of 17 physical therapy visits through March 11, 2018. He no longer ambulated with his cane during therapy sessions and showed improved gait pattern and posture. (*See* Tr. 379, 378, 373, 365, 363, 363, 359). His postoperative restrictions were lifted, and he was allowed to drive and wean himself off his back brace. (Tr. 375).

At his second reassessment on March 11, 2019, Ash showed more improvement in range of motion at the lumbar spine, though he did not meet goals for full improvement. (Tr. 355-59). He showed full 5/5 strength throughout all muscle groups of his bilateral lower extremities, ambulated without the assistance of a cane and reported doing the same in his house, and reported moderate (5/10) pain level. (Tr. 355-56). Through the last month of his physical therapy sessions until April 8, 2019, Ash did not present with a cane when walking, showed improvement in strength of trunk flexion to full 5/5, and reported no more than moderate pain intensity level 4/10 to 5/10. (Tr. 352, 349, 346, 343-45). When his formal physical therapy ended, he continued to demonstrate full strength in both lower extremities and had 68% of full lumbar range of motion. (Tr. 344).

Further, as noted by the ALJ, Ash's reported daily activities were inconsistent with Ash's opinion that he required a cane. For example, in his early postoperative period (November to December 2018), Ash told his physical therapist that he was walking more, doing dishes, pulling laundry out of the washing machine, and even mopping floors. (Tr. 403, 394, 425). Additionally, Ash's wife indicated in her July 2020 written report that Ash did chores and "projects" around the home with her, and that he helped his elderly mother with chores and shopping a few times in a

week, though Ash stated in his hearing that he only assisted his mother once a week. (Tr. 236). Ash's wife also reported that he performed household chores, such as doing the dishes, doing laundry within his limitations, and preparing simple meals. (Tr. 238). Besides household chores, Ash's wife reported that he had ridden his motorcycle two to three times at the time of her written report. (*See* Tr. 340). When physical therapy concluded in April 2019, Ash stated that he brought his cane with him, but he was not using it when he went on walks. And he reported only difficulty walking up and down hills. (Tr. 343).

Next, as the ALJ points out in a different part of his decision, there is no evidence that indicates that the cane was prescribed. Indeed, the ALJ noted that Ash's wife's written report "all but confirmed that the cane has not been prescribed." (Tr. 31). Indeed, she conceded this point, but then asserted that, prior to surgery, Dr. Mason "didn't see any problems with this." (Tr. 243). The ALJ referred to both the physical record, discussed at length above, and Ash's daily activities when discounting the opinions of Ash's wife. (Tr. 25, 26, 236-43, 343-46, 349-352, 355-59, 362-63, 356, 373, 375, 378-79, 381-83, 394, 399, 403, 409-13, 422, 425, 433, 504). While a prescription is not necessary to establish the requisite medical need under SSR 96-9p, "[t]he lack of a prescription [] is an appropriate factor to consider as to whether substantial evidence supports the ALJ's decision that a cane was not medically necessary." *Stupka*, 2021 WL 508298, at *4 n.4 (quoting *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *5 (S.D. Ohio Mar. 13, 2019); *see also Swearengin v. Berryhill*, No. 3:17-cv-32, 2018 WL 5045216, at *4 n.4 (E.D. Tenn. Oct. 17, 2018).

Finally, the ALJ acknowledged the identical item that Ash cites in support of his cane limitation, *i.e.,* his one year follow-up evaluation with his neurosurgeon, Dr. Hartzfeld, on October 9, 2019. (Tr. 27). The ALJ also noted that on June 8, 2020, six months after Ash's return visits to

Dr. Hartzfeld, Ash saw his primary care doctor for constant pain in his back and legs, as well as weakness in the leg(s), and physical examination revealed nonspecific signs of decreased range of motion, joint tenderness, and limping gait. (Tr. 27 (citing Tr. 613, 616-17)). Yet, the objective evidence when viewed as a whole, specifically the notes throughout the course of physical therapy, led the ALJ to reasonably conclude that Ash's use of a cane was not medically necessary.

Ash cites to evidence that *may* support the medically necessary use of a cane. Yet, ample substantial evidence supports the ALJ's ultimate finding that the cane was not medically necessary. "[W]here there is conflicting evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence.'" *Hess v. Comm'r of Soc. Sec.*, No. 1:20-cv-01599-JDG, 2021 WL 2815854, at *17 (N.D. Ohio July 6, 2021) (quoting *Forester v. Comm'r of Soc. Sec.*, No. 2:16-cv-1156, 2017 WL 4769006, at *4 (S.D. Ohio Oct. 23, 2017)); *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) ("Our role is not to resolve conflicting evidence in the record…"). As established above, the ALJ's decision reveals that he considered the evidence regarding Ash's required use of a cane but did not find it fully credible in light of the inconsistencies in the record discussed at length above. *Cruz-Ridolfi v. Comm'r of Soc. Sec.*, Case No. 1:17 CV 1075, 2018 WL 1136119, at *16 (N.D. Ohio Feb. 12, 2018), *report and recommendation adopted*, 2018 WL 1136119 (N.D. Ohio Feb. 28, 2018). Ash has not established how the ALJ's reliance on the objective medical evidence and his reported daily activities was unreasonable in reaching his conclusion. Thus, I conclude that the ALJ's conclusion that his cane use was not medically necessary was supported by substantial evidence.

Accordingly, the ALJ's decision not to include a limitation in Ash's ultimate RFC has the support of substantial evidence in the record. The ALJ presented the VE with a hypothetical person with Ash's residual functional capacity and asked the VE whether such a person with those

limitations could perform Ash's past relevant work. (Tr. 65-66). Based on the VE's testimony, the ALJ made the Step Four determination that Ash could perform past relevant work as an Archivist. A hypothetical question is not improper solely because it does not include all of a claimant's alleged impairments. Rather, an ALJ is required to incorporate only those limitations accepted as credible. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). Thus, I find that Ash's assignment of error lacks merit. Accordingly, I recommend that Ash's assignment of error should be overruled and the ALJ's decision should be affirmed.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court OVERRULE Ash's assignments of error and AFFIRM the ALJ's decision.

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate

Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

Dated: December 28, 2022

*s/ Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
United States Magistrate Judge